Good morning, Your Honors. I'd like to reserve three minutes for rebuttal, please. Just keep an eye on your clock. May it please the Court. This is an unlawful termination case based on discrimination. Step one, Mr. Mahalona was a member of protected class Asian Pacific Islander. He was qualified for his job. I think here's where the District Court made the error implied the wrong standard. Their decision was based on his failure to perform according to TSA's legitimate expectations at the time he was removed. I think the proper case to follow would be Aragon. Isn't Aragon more of an outlier? It seems like most of the cases, if not explicitly, at least implicitly differentiate between refusal to hire and a dismissal. And a dismissal uses the perform satisfactory, whereas a refusal to hire is a qualified. Well, I think there are cases that have applied Aragon. Recently there was the Mueller v. Car Wash Partners case that didn't apply it but said it was the better reasoned case. Is that a published opinion? I believe so. Willard, it's called? Mueller v. Car Wash. All right. Go ahead. And it points out that the older standard in Segupta, that he was doing his job well enough to eliminate any possibility that he was laid off for inadequate job performance, is an awfully high standard to make somebody— But this is my question. I mean, assuming that you're right that the standard at the beginning should be very limited and assuming further that— And I thought one of the things you said in your brief, which had some resonance for me and seems to be supported by the case law, is that the actual reason they gave, i.e. failing this test, should not be part of the inquiry because that's the subject of the pretext question. All right. So I'm supposed to get by all that. And what McDonnell Douglas says the cases are very clear about is a way of figuring out whether there's enough evidence for discrimination. But that's the ultimate question. As the plaintiff met their burden of demonstrating circumstantial or direct evidence that's sufficient to suggest that there's more likely than not discrimination. So why don't we just focus on that question now and ask what evidence do you have that there was actually discrimination here? Well, we have six similarly— All right. Well, that's the question. And I found the record very confusing about that. My understanding is that four of those six were dual-function employees, and they were basically reassigned pursuant to what the standard actually says, which is that you can reassign dual-standard employees. So why are they similarly situated? Well, two things, Your Honor. They're similarly situated because if you read the opening brief at page 42 to 43, all of them had to pass that test. And then on 43, it goes on to talk about that there's two routes that the agency can take if somebody meets the criteria that they set out, that they can either retrain them on the other function or switch them if they're dual-function. Well, that's true. But that doesn't make these people similarly situated, first of all, because they, in this instance, they didn't have to retrain them at all. They just could assign them to the other job. But also, I thought the record was very confusing on this. At some points, you seem to be saying in the depositions and so on that he was a dual-function employee, but he wasn't at this time. Is that right? I'm sorry for the confusion. He was not a dual-function? Okay. Because there were questions about that, which suggests he were, but it seems he wasn't. But he also, one of the early letters that he sent said, notes this retraining thing, but says, all I want is a chance to take the test a fourth time, and doesn't say that he wanted to be retrained. Did he ever ask to be retrained? I don't know whether he asked to be retrained specifically, but I do know that that's one of the two options open. Right, it's one of the two options, but he specifically seems to have negated any interest in it. I don't know. All right, so let's say we back out those four people, and then what? Well, then we have Mr. Espin, who also failed the test three times. He made a claim that he was not properly remediated. Mr. Mahalona made a claim that he was not. But they were completely different claims as to why they weren't sufficiently remediated. Well, Mr. Espin only said that there wasn't a signature on the remediation. That doesn't mean that he was not actually remediated. Mr. Mahalona made— It means they didn't have documentation that he was. That's one of the things. And I think at that point, the supervisor could have gone back and asked the person who remediated him whether he actually remediated him, and to sign that— But with regard to whether your client or your client's deceased had, in fact, demonstrated any lack of remediation, I mean, the agency insisted that he was properly remediated, and his claim to the contrary seemed to be based on some old standard that was from 2010 that said there was supposed to be 10 hours, but now that doesn't seem to be in place anymore. So in what way was he not adequately remediated? I'd have to go back and find the exact claims, Your Honor. That's fairly central. All right, well, then don't. I mean, they were pretty specific to the function and to the rules of remediation. There has to be a certain amount of time between each remediation. Well, he did do that. I mean, that was up to him, the time. I'm sorry? It was up to him, the time. Well, it's up to him, but there's a standard in the TSA regulations as to how much time— Up to 15 days, and he chose within the 15 days. Okay, and then if the court wants me to, I can find the actual claims he makes about the improper remediation. Well, you ought to be able to know that before you stand up here. And I apologize— Were you the lawyer in the district court? I was, Your Honor. You were a lot clearer at that point. Anyway, you were a lot clearer at that point, or somebody was. All right, so we don't really know why he thinks he wasn't properly remediated. But we do know that it wasn't investigated by the TSA, and they just made a conclusion that he was properly— We don't know it wasn't investigated. We just know they concluded that he was properly remediated, and they went through exactly what his remediation was, and he said that was proper. And we say that he wasn't, so that's the factual dispute as to that part of it. All right, suppose that were true. Would that be enough by itself to demonstrate that he— When there is nobody else making similar claims of poor remediation, there are different claims. Would that be sufficient to conclude that there was a pretext here? No, I don't think that would be sufficient. All right, well, if it's not, then where's the pretext coming from? The pretext comes from three factors to the fact that the comparators were all treated better. Further, the fact that there was—they didn't follow the procedure. There was no determination that any of the people who were allowed to stay with the TSA were— I'm sorry. I want to get the exact— He didn't evaluate their satisfactory performance, attendance, and service prior to making the decision that he would keep them on, allow them to switch, and he didn't make that decision in any of the cases. He's testified to that as his deposition. I'm sorry. Now you're going back to the—these are the people who were allowed to— the dual-function people who were allowed to go to the other function? Yeah, so the court had asked me if there was other evidence of pretext, and one of the factors and pretext is that they deviated from TSA policy in that they didn't make a determination that any of the employees who were allowed to stay, or Mr. Mahalona, had satisfactory performance, attendance, and service prior to the decision. But I guess I don't see how that's—I mean, your client didn't ask and I guess wasn't qualified for moving into the other function. So, I mean, if he had and they said no, that would be a different case. But I guess I don't see how—what they did with this other function that he wasn't performing that is relevant. I don't know if you're getting this—getting at this, Your Honor, but there was two ways they could have kept him employed. They could have—if he was dual-function, they could have—or they could have retrained him. But he specifically said that he—after noting that possibility, he said he only wanted a fourth chance to take the test. I think that would be the first step before he gets to whether he gets retrained or not, is to say, I was not properly remediated. I would like a chance to take the test again. But he never asked to be retrained. He specifically said he didn't want to be retrained, essentially. But this is going to the evidence of the pretext and why it would be pretext in this case, I think, Your Honor. And just on the remediation, he did sign a form that said that he had been offered remediation. Is that right? I believe so, yes. Okay. And then the final example of why there's pretext is that Mr. Scheer had changed his reasoning, first saying—first admitting that he was the decision-maker in this and then trying to push it off on Mr. Parsons as the decision-maker. If there are no further questions, I'll hold my time. Reserve the remainder of your time. Thank you. Ms. Che. Good morning, Your Honors, and may it please the Court. Assistant United States Attorney Jessica Che on behalf of the Secretary of Homeland Security. The Aviation and Transportation Security Act mandates that all screeners pass an annual proficiency review as a condition of employment. And under the Act, an individual may not— Well, it doesn't really. It says they're subject to discharge, but there are exceptions. That's correct, Your Honor. And the two alternatives that my colleague referenced were if you were a dual-function officer, that you can be rerouted to—with the discretion of the federal security director, rerouted to the other function in which you were certified. It's undisputed that Mr. Malolono was not a dual-function officer. He was only certified to be a checked baggage screener. And the panel is absolutely correct that he did not ask to be retrained in the— Why should we be doing this? Are you arguing that we should be doing this at the prima facie stage case instead of looking at the record as a whole and figuring out whether there is sufficient evidence? Well, I agree with Your Honor that the McDonnell-Douglas standard is but one way to evaluate these cases. I think— And it is not helpful, as far as I can see, and the Aragon case says as well as just some other opinions, to back the whole question of why he was actually discharged and whether it was other people were treated differently into the prima facie case consideration. That's not what McDonnell-Douglas was trying to do. Well, McDonnell-Douglas suggested strongly that the elements of the prima facie standard are flexible and can be tailored to— And minimal. The burden is minimal, correct. And in fact, you know, it was interesting. I hadn't read McDonnell-Douglas in a long time. It turns out that those employees actually had been employed, and they had been laid off, and it was technically a rehiring situation, but the reason that they were, quote, not rehired was because of actions they had taken while they were employed. And so, in fact, by— And the—McDonnell-Douglas did not take this question of whether their protests just qualified them into the prima facie stage. They regarded the prima facie stage as whether they had the qualifications to do the job, i.e., you know, whether they could physically do it. And then they took the other issue and put it into the pretext stage, which is, it seems to me, what's being argued here. Or you can just forget the whole thing and just look at—step back and look at the end product and say, is there sufficient evidence of—as a plaintiff, that it's burden of discrimination? But why you want to—it's not logical to put the whole thing into the prima facie stage. I'll just note that I agree with Judge Lee that the Aragon case is an outlier in cases— Well, even if it's an outlier, it's still there. And we don't— It's still there. So if we were to rely on one or the other, we would have to go on bank, frankly, because there are conflicting decisions. Both before and after. Even if one's an outlier. Even if one's an outlier. Correct. But both before and—published opinions in this Court, both before and after Aragon, have applied the more flexible— Okay, but still, according to our rules, we don't just wash things out because people misread them or— Correct. But I would also note that even Aragon, in articulating that standard, still considered the plaintiff's self-assessment of the sufficiency of his performance. So that was part of the Court's analysis in that case. If I may interrupt, the test here, would you consider that to be a qualification or failing to perform or both? I think it can be both, Your Honor. And I think that regardless of which standard this Court chooses to apply in terms of whether he was—whether the question is whether he was qualified to perform his job or whether he was performing satisfactorily, I think the outcome is the same. The fact that he was— Suppose you had a place that had a rule that said—well, let's take this, but slightly different facts. You have to pass the test. But as a matter of fact, he could demonstrate that they ignored that often. Could you still rely on the paper requirement that you pass the test? I apologize, Your Honor. I didn't— Suppose the plaintiff said—suppose the document said, which it doesn't, but definitively, that if you don't pass the test, you get fired. But suppose that that was honored in the breach quite regularly. Could you nonetheless rely on that as a qualification? I apologize, Your Honor. I'm not understanding your question. I think the question is—suppose you had the same facts as here. You've got the same policy. You have to pass the test to stay employed. He fails the test. But in fact, he comes in with, you know, here are dozens of other people who failed the test and were not fired. If he had that evidence— In other words, if I'm understanding correctly, if he had valid comparators who were— Well, I think that that would be—that would satisfy one element of the prima facie test. No, it wouldn't. It would really come in at the pre-check stage. Yeah, because I thought your position was he just loses at step two because he can't show that he's qualified. The court only got to step two. But I think that the test is—you know, the only variable with regard to the test in this court's cases is that second prong, where the question in, for example, non-selection cases is whether the plaintiff is minimally qualified for the position to do the job. In—by contrast, in either discipline or discriminatory— He, in fact, had done the job for many years. That's correct, Your Honor. Right, so in terms of whether he was qualified to do the job in a minimal sense, did he know how to do the job? Generally, yes. He did not—there was an additional requirement. He didn't pass in. Whether that was really a barrier or not is what is contesting. And to stick that all into the prima facie case really washes out. I don't know how the comparators even come in at the prima facie case stage. They don't, logically. Well, Your Honor, I would— my response to that is in terms of the qualification piece of it, even if the court chooses to say, okay, he has to show that he is qualified for the position, the fact that he was not able to satisfy the statutorily mandated requirement at the time of his removal means that he was not qualified for the position. The annual recertification process is required by statute. The fact that he was not able to— But his contention, even if it fails, is that there were other people who didn't pass the test and nonetheless were employed. So you need to look at that evidence, even if you decide that it's not convincing. When you're looking at it, are you still looking at whether he's qualified or are you looking at something else? I think that it can be both, frankly. I mean, the comparators are whether the plaintiff can adduce evidence of similarly situated individuals outside his or her protected class who were treated more favorably is part of the prima facie test. But then you've backed the whole thing into the prima facie case, and you don't—I mean, you can call it the same thing, but it's really a pretext discussion at that point. Well, I also agree with Your Honor that you don't have to do any of that, and we can just look to the question of whether the evidence presented in this record— Which was Aragon's point exactly, that you're doing this in the wrong place. And it matters in terms of discovery and so on. If somebody walks in and can't allege more than was alleged here, I don't even know if he gets discovery if it's really part of the prima facie case. But if he alleges what he alleged here, doesn't he at least get to find out whether these comparators are really comparators or not? The comparators—I guess I'm a little— The comparators, my understanding of the prima facie elements, are that you have a member of a protected class, there is an actionable personnel action, similarly situated people were treated— outside of the protected classes were treated more favorably. So that is my understanding of McDonnell-Douglas's general framework. Now, I think that there have been cases— Well, specifically, it's the job was left open in the McDonnell-Douglas situation, and other people not with the protected class were hired. Correct, and so I will note to that very point— whether they're similarly situated, not even that much, just were other people without the protected class hired. So with respect to that specific point, Your Honor, this court long ago actually reversed the grant of summary judgment where a district court— where it concluded that the district court applied McDonnell-Douglas too literally, specifically to that whether the position remained open prong, and that was also a non-selection case. That's the Higgins v. Andrews case. So I think that that's indicative of this court's inclination, other than in Aragon, to apply a more flexible standard. But I agree with you that we can look— even if we assume that he's made the prima facie case, we can look to whether the evidence as a whole in the record gives rise to an inference of discrimination. I would submit to you that it does not. So can I—just to be clear about how this works in your view. So suppose we have— an employer has a policy like this one, you must pass the test to stay employed. That's the policy. The employee has failed the test and has been fired, and he is able to come in and say, here are several similarly situated people who failed the test, but were not fired. If that's the universe of evidence, the employer moves for summary judgment. Does the employer get summary judgment in your view? If— If that's all we have? If the—in other words, if there are— if the plaintiff has presented evidence of comparators who were— like true comparators who were similarly situated. True comparators, like people just like me, but of a different race or whatever. I think that the court would still need to examine whether there is pretext, whether the agency's proffered reason— whether the agency didn't honestly believe the reasons for taking it. That wasn't the question. The question is whether there was a prima facie case. Well, I do think that the comparator prong is part of the prima facie case, and then you look to whether the agency has proffered a legitimate reason for taking the challenged action at issue. Then the burden again shifts to the plaintiff to adduce— That's basically what happened here. He came in and he said that there were comparators who were not in fact fired, and so why don't we move on at that point? He said there were—his position is there were comparators who were not in fact fired. The employer's position is there were not in fact legitimate comparators, right? Yes, that's correct, Your Honor. So why aren't we by the prima facie case at that point where the employer now says, well, I fired him because he didn't pass the test, and now he says—and not only that, but these people aren't really comparators, so he hasn't proven pretext. Isn't that the logical way to look at this problem? Well, I think it's certainly one way to look at the problem, and I will also add that the plaintiff submitted— relied on the comparators both at the prima facie stage and in arguing that there was pretext. So I agree with you that we can look at it at either stage, but I would submit to you that the comparators are not valid comparators. They were not materially—they were not similarly situated in the material respects that this court requires. If an employer has a rule that anybody who steals something gets fired, and they're all NRA cases like this, and so he fires this person because he stole something, and the person comes in and says, well, you know, yes, you do have that rule, but I can give you ten instances in which people stole something and didn't get fired. At that point, has he not met his prima facie case because he's not qualified, or because his employer—he hasn't demonstrated that he is, whatever the other language is, that he—enough evidence to show that he was not fired for that reason, or does he move on? To trial, you mean? No. Well, at least at the summary judgment stage to the question of whether these ten people who he says also stole things but didn't get fired actually did steal things and whether there were different circumstances or whatever, i.e., the pretext stage. Well, I will say I think that the cases are a little bit inconsistent because there are cases from this court that have said that the existence of valid comparators is indicative of pretext, but there are also cases that say that a Title VII plaintiff alleging discrimination must offer more evidence than what was offered at the prima facie stage. So if we're taking my view that— Title VII plaintiff what? I didn't hear the whole sentence. What part did you— If a Title VII plaintiff does something, you said. If the—I've entirely lost my train of thought. I'm so sorry. I'm sorry. But I think that the point I was trying to make is that there are also cases that say— so if we're taking my view and saying that the comparator issue comes in at the prima facie stage, which I think that Your Honor has disagreement with, then there are cases that say that the plaintiff has to come up with more than that at the pretext stage to show that there is specific and substantial circumstantial evidence. Well, yeah. So in the prima facie case, he says there are comparators. That's what he did here. He said there were comparators. Correct. Isn't that enough for a prima facie case if he says there are comparators? I would submit that there is not—if, as here, he has neither demonstrated that he is qualified nor that he was performing according to the agency's legitimate expectations. Without regard to the comparators. Without regard to the comparators because the district court didn't reach that issue. Your Honor, I see I'm out of time. If the court has no further questions, let me just submit and ask that the court affirm the grant of summary judgment in favor of the Secretary. Thank you. Thank you very much. Unless the court has any specific questions, I'll just run through that real quick. So I'd just like to point out that to prove that my client was not meeting the agency's legitimate expectations at the time he was fired would assume that his dismissal and his failure to pass the test, his failure to be given remediation were all, in fact, legitimate reasons. But the plaintiff's claim is that all of those things were discriminatory. So it's kind of bootstrapping it and making me prove the burden that's supposed to be the agency's at the second step where they say we have a legitimate reason. I would point to cases like they're out of circuit. Well, they're in circuit case of Bari, which says that the determination of whether someone's qualified is limited to the period prior to the introduction of the alleged unlawful discrimination. And then out of circuit there is Cicero from the Sixth Circuit, which says that a court must evaluate whether a plaintiff established his qualifications independent of the employer's preferred nondiscriminatory reason. And then Curry and Flores from the Seventh Circuit, which essentially say the same thing with respect to that qualifications issue. As I pointed out before, you can read McDonough Douglas itself that way as well. I'm sorry? You can read McDonough Douglas itself that way as well. Yes. I think to put the other standard, to put the standard that I would have to show something to the effect that he was doing the job well enough to eliminate the possibility that he was laid off based on discrimination. Right, but you still have a problem, which is let's assume all that. Let's assume we're at the pre-check stage. How do you win on the current record? On the current record, I win on the three things I mentioned earlier, that the comparators, none of whom were in the same ethnicity, the same racial character, the same racial class, the fact that they didn't follow the TSA's guidelines when they allowed those people to stay and fired Mr. Mahalona. But they're differently situated. I guess that's the point here. I mean, who's the person who's most comparable to the plaintiff here? The TSA regulations say that all TSOs, LTSOs, and STSOs have to pass that test. And all of the comparators are either TSOs, LTSOs, or STSOs. So they're all similarly situated in that fact that they all have to pass that test. And then do you agree the four of them who are dual function people are not comparable because they had an option under the policy to be recategorized to their other function? Do you agree with that one? I agree that they're not exact to Mr. Mahalona. I mean, there's a pretty significant difference when the policy says, if you're dual function and you fail this exam, you can be recategorized to the other functions. I mean, they seem pretty immaterial difference there. Yes, Your Honor, but the policy also allows another alternative to keep somebody employed, and that is to retrain him in the other function. Am I wrong in believing that your client specifically disavowed that option? He only wants another chance to take the test. I don't know whether he was specifically disavowing it, Your Honor, or he was saying that as that was the next step in his perception. In the letter that he sends, he writes out the standard, including retraining. And then in the next sentence, Mr. Mahalona, is that his name, only wants the opportunity to take the test for the fourth time. Not only wants it, but only wants it. I will submit to the court's recollection that that is better than mine, and I'm over my time. Thank you, Your Honor. Next time you get up to argue, you should know the record. Thank you. Thank you, counsel. We thank both counsel for the arguments, and the case is submitted.
judges: BERZON, MILLER, LEE